**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **A1 MORTGAGE CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **2:03-cv-2002** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **A1 MORTGAGE AND FINANCIAL** | ) | |
| **SERVICES, LLC,** | ) | |
| | ) | |
| **Defendant.** | | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF COURT

In the Court's prior Memorandum Opinions of June 1, 2004 (Defendant's Motion to Dismiss) and August 20, 2004 (Plaintiff's Motion for Preliminary Injunction), the litigation history between these parties, underlying facts of this lawsuit and factual findings with legal conclusions to support the issuance of the preliminary injunction have been set forth in detail. Defendant, A1 Mortgage and Financial Services, Inc. ("Financial Services"), was preliminarily enjoined from using the domain name "A1Mortgage.com" during the pendency of this lawsuit.

The evidence and testimony adduced during the preliminary injunction hearing established, *inter alia*, the following:

1.  Financial Services does not have any trade mark rights in the domain name "A1Mortgage.com" as the domain name does not consist of the legal name of Financial Services, but rather is the legal name of A1;

2.  Financial Services did not purchase the subject domain name until May 2003; and

3.    Financial Services began using the subject domain name sometime after it was well aware of the existence of A1 and well after the settlement of the Westmoreland County litigation.

The Court found and ruled that, for the purpose of the preliminary injunction motion, there was sufficient record evidence that Financial Services acted with a bad-faith intent to profit when it registered and used the domain name "A1Mortgage.com."[1]

The final evidentiary hearing was conducted on January 12, 2005, which results in the following additional findings of fact and conclusions of law.

## FINDINGS OF FACT

1.    Since its formation in 1996, A1 Mortgage Corporation ("A1") has continuously advertised and operated its business utilizing the name A1 Mortgage.

2.    A1 also registered said name for mortgage brokerage and financial services under Pennsylvania Trademark Registration No. 3011052.

3.    A1 has become reasonably well-known in the performance of its services through the expenditure of substantial time, effort, and funds to promote its business to consumers by advertising on radio, television and the worldwide web.

---

[1]    Section 1125(d)(1)(B)(ii) provides a safe harbor for Financial Services if it can show that it "had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."

4.      Maria Makozy, President of A1, testified that in the past four years, A1 expended

        significant amounts on advertising its mortgage services as follows:

                a.      2002:  Approximately $537,000

                b.      2003:  Approximately $1 Million

                c.      2004:  Approximately $1.2 Million

                d.      2005:  Budgeted $1.2 Million


5.      Also, during these years of extensive advertising, A1's business volume has grown

        exponentially as follows:

                a.      2001:  $13 Million

                b.      2002:  $56 Million

                c.      2003:  $115 Million


6.      In 2001, Financial Services registered as a Pennsylvania Limited Liability Company and

        opened its office within approximately thirty miles of A1's location.


7.      James Keen, President of Financial Services, testified that he and employee Roy Brown

        collaborated on names for his business and settled on A1 Mortgage and Financial

        Services, LLC as its name.  In his deposition, Brown apparently failed to corroborate

        Keen's testimony in this regard.

8.      The mortgage brokerage and financial services offered by Financial Services are identical and in direct competition to those provided by A1.

9.      Although the parties settlement of the Westmoreland County litigation required that a disclaimer be placed on all Financial Services' advertising, its website did not reflect any disclaimer until after the instant lawsuit was filed, despite Keen having been solely responsible for the content of the website.

10.     Within five (5) days of the filing of this action, a disclaimer appeared on Financial Services' website.

11.     Keen testified that he had previously placed an order with Verizon for the disclaimer, however, the credibility of that testimony is suspect insofar as Keen was able to effectuate a website disclaimer in less than a week between the filing of this action on December 31, 2003 and the TRO hearing on January 6, 2004.

12.     At the preliminary injunction hearing, Keen testified that, "90-95%" of the time, Financial Services was doing everything that was required of it under the terms of the Settlement even during the period that the Settlement Order was on appeal.

13.     At the preliminary injunction hearing and at trial, however, when questioned about numerous exhibits reflecting advertisements of Financial Services on which no disclaimer

4

appears, Keen's testimony varied in that he stated that many of the advertisements which had no disclaimer were ordered before the appeal of the settlement order was final in August of 2003.

14.     In Financial Services' late 2003 advertisements, the subject domain name was correctly identified, but the advertisements still failed to include the disclaimer required by the Settlement.

15.     Financial Services consistently had a series of advertisements in a particular North Hills regional telephone book, which was comprised of a large highly visible ad on the gatefold front cover with no disclaimer, followed by several smaller ads in the internal yellow and white pages of the book.  Of all the smaller internal page ads, only one reflected a disclaimer, while another immediately beneath it reflected a Cranberry address with no disclaimer.  This pattern of multiple advertisements, most with no disclaimer, was consistently repeated in a number of regional telephone directories.

16.     The front page advertisement reflected in Ex. 28, contained no disclaimer and the purposeful absence of a disclaimer was confirmed by a review of the order form (Ex. 29) for the ad which reflected that no disclaimer had been ordered for the ad.  Keen's explanation was that he simply "hadn't gotten that far."

17.   During the trial, Plaintiff produced a number of yellow page and white page advertisements published in 2003 for the 2004 calendar year that did not include any disclaimer. (See Plaintiff's Exhibits "25" and "27"). Moreover, the proofs for these ads were reviewed by Financial Services in the summer of 2003 which timing is notable.

18.   In response to an inquiry from the Court, Keen testified that he did not have any notes, letters, e-mails or anything in writing whatsoever which document his instructions to the ad agencies or directory companies that the disclaimer was to be included and printed on every advertisement which he purchased.

19.   Keen testified that the lack of disclaimers on Financial Services' advertisements in the referenced telephone directories were all the result of mistakes or oversights by or on behalf of the ad agencies or directory companies despite his having ordered and allegedly reviewed proofs of the ads.

20.   Keen also testified that "everyone" at these telephone directory companies knew to put a disclaimer on each and every ad, yet many directory ads reflect the same deficiency - no disclaimer.

21.   It is quite clear from the testimony and evidence that Financial Services repeatedly failed to include the agreed upon disclaimer in much of its media advertising.

22.     Keen's explanations regarding the lack of disclaimers on a significant percentage of
Financial Services' advertising do not have the ring of truth as he impressed the Court as
a smart, shrewd, tough, direct and detail-oriented businessman who would not tolerate
such mistakes, much less make them.  The Court finds that the pattern of disclaimers not
appearing on Financial Services' advertisements was the knowing, intentional and
purposeful act(s) of Financial Services through Keen.

23.     Interestingly, correspondence from these directory companies to Financial Services
identify Financial Services by the name "A1 Mortgage" which, of necessity, must be
reflective of the manner in which Financial Services holds itself out to these businesses
with which it deals on a regular basis.

24.     In addition, the office facsimile machines of Financial Services print "A1 Mortgage" as
the sender in the identity header of outgoing correspondence.

25.     Tyler Courtney ("Courtney"), a co-principal of Financial Services, with full knowledge of
the specific radio stations on which Financial Services advertised in 2003, issued a
memorandum to employees on September 22, 2003 which instructed employees to
respond to inquiring callers that the employee knows that Financial Services advertises on
radio, but he/she does not know the specific radio stations on which it advertises.  (Ex.
19).

26.     Through testimony, Courtney disavowed having authored, seen and/or distributed said memorandum.  However, two former employees (Myra Jean Lenz and Michael Wright) testified that they each received the memorandum on their desks with their respective names handwritten which each recognized as Courtney's handwriting.

27.     The testimony of Courtney is not credible in this respect and the retort instruction could have no other purpose than to cause confusion among potential customers regarding the commercial radio advertising of Financial Services and A1.

28.     Keen testified that he initially tried to purchase the domain name "A1Mortgage.com" in September of 2001, but it was unavailable at that time.

29.     Upon learning of the availability of that domain name in May of 2003, and despite Financial Services' prior history of litigation with A1, Keen still wanted to purchase the domain name "A1Mortgage.com" because a shorter domain name would generate "more hits".  This domain name purchase was sought despite the fact that Financial Services was already operating with the domain name "A1MortgageLLC.com".

30.     Sam Price ("Price") of Media Post testified that clients normally purchase a domain name themselves, but in this instance Courtney specifically requested that Media Post purchase the domain name for Financial Services because it "did not have the money" at the time.

31.     Coincidently in 2003, the year the domain name was purchased for $900, Financial

        Services had 510 first mortgage transactions valued at $52,827,182.00.

32.     It appears that Keen and Courtney purposely purchased the domain name through Media

        Post as a straw party to shield or guise the action of Financial Services in acquiring the

        subject domain name.

33.     On May 6, 2003, Financial Services, knowingly and intentionally purchased the domain

        name "A1Mortgage.com", and it became operational in August of 2003, the same month

        that the Settlement appeal became final.

34.     The Al Mortgage.com domain name purchase was made despite the earlier lawsuit

        between these parties over A1 Mortgage's trade name, the settlement of which was

        upheld by the trial court in January, 2002 and later on appeal.  Again, that settlement

        required disclaimers on all Financial Services' advertisements which it continuously

        failed, neglected and/or implicitly refused to abide.

35.     Keen testified that it was important for Financial Services to obtain the domain name

        because: a shorter domain name would get more hits, "it would simplify" it for the

        consumers, "if someone sat down at that computer and typed it in, it would go straight to

        our existing website".  Financial Services was already using A1MortgageLLC.com and

        the new domain name was simply shorter.

9

36.     Keen admitted, "I took the mark, the domain name, and I used it, yes, sir".

37.     Keen testified that his acquisition and utilization of A1Mortgage.com was not intended to create confusion with A1 and he didn't believe that it would cause confusion.  The domain name would simply make it easier to access Financial Services' website and the information on the website would clarify any confusion.  Again, the Court finds Keen's testimony in this regard to be less than credible.

38.     Financial Services' utilization of the domain name "A1Mortgage.com" could have no other effect than to mislead consumers and cause confusion in the marketplace regarding the mortgage brokerage and financial services being marketed and sold by Plaintiff A1 MORTGAGE CORPORATION under its trade name A1 Mortgage.

39.     Keen and Courtney, acting on behalf of Financial Services intentionally acquired and utilized the domain name "A1Mortgage.com" with full and complete knowledge and understanding that A1 Mortgage was and is the trade name of Plaintiff and that utilization of the domain name would mislead consumers and cause confusion.

40.     It is undisputed that Financial Services' internet leads for mortgage brokerage and financial services increased dramatically immediately upon its utilization of the subject domain name.

10

41.   Ms. Makozy testified that as a result of the actions of Financial Services, A1 has had to change its radio and TV advertising to say "if it's not A1 in Cranberry, it's not A1", spell out "corporation" in ads so that people could get to the right website, and go to great lengths all at great cost and inconvenience in advertising "to explain who we are.  We can't explain our products because we're trying to explain where we're located, if they are at the right A1  ...  and ...  if they are on the right website and all that."

42.   It is virtually impossible to determine the number of customers or potential customers and corresponding business profit which A1 has lost and/or Financial Services gained as a result of the bad faith and unlawful use of Plaintiff's trade name by Financial Services' utilization of the subject domain name, "AlMortgage.com"

## CONCLUSIONS OF LAW

43.   The viable allegations of Plaintiff A1's Complaint, which remain are the following:

    (a)    Count II - in which A1 alleges that Financial Services has violated the Lanham Act (15 U.S.C.A. § 1125) by misrepresenting the nature, characteristics, qualities and/or geographic origin of its services;

    b)    Count III - in which A1 alleges that Financial Services has violated the Lanham Act (15 U.S.C.A. § 1125) by using the domain name "A1Mortgage.com"; and

    c)    Count VII - in which A1 alleges that Financial Services has interfered with its contractual relations.

11

44.    Section 1125 of the Lanham Act provides, in relevant part:

    1)    Any person who, on or in connection with any good or services or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which -

        A)    is likely to cause confusion, or to cause a mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

        B)    in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

    Shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125(a)(1)(1999).

45.    Section 43(a) of the Lanham Act ("Act") protects qualified federally unregistered trademarks, to the extent that interstate commerce is involved.  15 U.S.C. §1125(a).

46.    Although A-1 is providing its services predominantly intrastate, the trademark qualifies for protection under the Act, "even without any evidence that a plaintiff has sold his products and services to a citizen of another state, he has caused his products and services to enter interstate commerce by advertising them in media forms that do cross state lines." Susan's, Inc. v. Thomas, 1993 U.S. Dist. LEXIS 4793, *10 (D.Kan. March 19, 1993).  A1 presented evidence that it advertised in other states.   Thus, the "uses in commerce" requirement was satisfied.  Id.  Further, Financial Services has failed to introduce any

12

evidence, or even argue, that A1's trade name does not qualify for protection under the Act.

47.     A-1 has demonstrated throughout the testimony and evidence that Financial Services intentionally failed, neglected and impliedly refused to abide by its settlement of the Westmoreland County litigation between the parties by consistently failing to include the required disclaimer language on much of its media advertising.

48.     The intentional failure by Financial Services to have included such disclaimer language in its media advertising constituted a "false or misleading description of fact, or false or misleading representation of fact which . . . is likely to cause confusion, or to cause a mistake, or to deceive as to the affiliation, connection, or association of such person with another person,  . . ."

49.     A1 has demonstrated through personal testimony and evidence of correspondence and facsimile transmissions that Financial Services identified and held itself out to certain businesses, if not the consuming public, as A1 Mortgage despite its specific knowledge that Al Mortgage was the Pennsylvania registered trade name of Plaintiff.

50.     A1 has demonstrated through testimony and evidence that Financial Services promoted confusion among inquiring consumers by its policy to not advise inquiring callers of the specific radio stations on which it advertised.

51.    A1 has demonstrated through testimony and evidence that Financial Services intentionally acquired and utilized the domain name "A1Mortgage.com" to falsely mislead consumers and cause confusion as to its affiliation, connection or association with A1 through commercial advertising and promotion.

52.    Count III of A1's Complaint alleges that Financial Services violated the Anti-Cyber Squatting and the Consumer Protection Act ("ACPA"), 15 U.S.C. §1125(d) which provides for cyberpiracy prevention, in relevant part:

    (1)(a)   A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of parties, that person

        (i)    has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

        (ii)   registers, traffics, or uses a domain name that -

            (I)    In the case of the mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

            (II)   In the case of a famous mark that is famous at the time of the registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

            (III)  Is a trademark, work or name protected by reason of <u>Section 706 of Title 18 or Section 22506 of Title 36</u>.

15. U.S.C. §1125(d)(1)A)(1999).

53.     In protection of such a trademark, the Act provides specific protection against anyone who, with a bad faith intent to profit from a plaintiff's mark, registers, traffics in, or uses a domain name that is distinctive at the time of registration of the domain name, or is identical or confusingly similar to the plaintiff's.  15 U.S.C. §1125(d).  This specific protection is known as the ACPA.

54.     A1 introduced testimony and evidence sufficient to establish that its mark 1) is distinctive and thus qualifies for protection; 2) that there is a likelihood of confusion; and 3) that Financial Services registered the domain name with a bad faith intent to profit.

55.     For a party to succeed on an ACPA claim, it must show that:

>    (a)     The mark is a distinctive or famous mark or that it is entitled to protection;
>
>    (b)     Defendant's domain name is identical or confusingly similar to plaintiff's mark; and
>
>    (c)     Defendant registered the domain with a bad faith intent to profit from it.

Shields v. Zuccarini, 254 F.3d, 476 (3rd Circ. 2001).

56.     The strength of a federally unregistered trademark and the degree of protection to which it is entitled under the ACPA are evaluated under the "distinctiveness" framework.  North American Graphics, Inc. v. North American Graphics of US, 1997 U.S. Dist. LEXIS 8107, *6-7 (S.D.N.Y. 1997).

15

57.     Marks are classified, in ascending order of distinctiveness, as 1) generic; 2) descriptive; 3) suggestive ; or 4) arbitrary or fanciful.  Id. at *7.

58.     If a mark is descriptive, the plaintiff must establish that it has acquired a secondary meaning in order to become distinctive and entitled to trademark protection.  Id.

59.     A mark is descriptive if it conveys information about the product, its qualities, ingredients, or characteristics, such as its purpose, use, size, or merit.  Id. at *8-9.

60.     An unregistered trademark is "distinctive" if it has been in substantially exclusive and continuous use in commerce for five years and through this use has acquired a secondary meaning.   15 U.S.C. §1052(f); Susan's, 1993 U.S. Dist. LEXIS 4793 at *5-6.

61.     A mark acquires secondary meaning if, because of association with a particular product or firm over a period of time, it has come to stand in the minds of the public as a name or identification for that product or firm.  Id. at 6.

62.     The requirement that descriptive words be used "so long and exclusively" by one producer as to acquire a secondary meaning is limited to acquiring a second meaning within "that trade and to that branch of the purchasing public."  Id. at 8.

63.     In determining whether a secondary meaning has arisen, courts first consider the statutory

        elements contained in 15 U.S.C. §1125(c)(1).

64.     A1 has established through testimony and evidence each of these elements, as follows:

        a.      Degree of inherent or acquired distinctiveness:   A1 has used its trade name

                continuously and exclusively in its targeted region and market since 1996, a

                period in excess of five years.

        b.      Duration and extent of use of the mark in connection with the services with which

                the mark is used: A1 has used its trade name continuously and exclusively in its

                targeted region and market since 1996, a period in excess of five years.

        c.      Duration and extent of advertising and publicity of the mark: A1 has  spent

                approximately $4 million on advertising and publicity between 2002-2005.

        d.      Geographical extent of the trading area: A1  and Financial Services offer the

                same products and services from offices within thirty miles of one another, with a

                consumer base covering Western PA and West Virginia.

        e.      Channels of trade for the services for which the mark is used: A1 and Financial

                Services both offer the same products and services, i.e., mortgage brokerage

                services which are advertised by the parties through the same channels of media,

                i.e., television, radio, print and the internet.

        f.      Degree of recognition of the mark in the trading areas and channels of trade used

                by the plaintiff and defendant:   A1 has used and advertised its trade name

                continuously and exclusively in its targeted region and market since 1996, a

17

period in excess of five years.

g.      Nature and extent of use of similar marks by others: There is no evidence of any

other use of a similar mark for mortgage brokerage services in the geographic area

serviced by the parties.

65.     Through A1's significant advertising efforts, substantial business volume, and favorable

reputation, its trade name has become well known as being indicative of its quality

services.

66.     Although A1's trade name is not federally registered, it is descriptive and qualifies as

distinctive.

67.     Having established A1's trade name as distinctive, the next step of inquiry is whether

Defendant's subject domain name is identical or confusingly similar to Plaintiff's mark.

68.     To demonstrate "identical or confusingly similar to," a mark holder must show more than

the theoretical possibility of confusion.  <u>American Steel Foundries v. Robertson</u>, 269 U.S.

372 (1926).  The law has long demanded a showing that the allegedly infringing conduct

carries with it a likelihood of confounding an appreciable number of reasonably prudent

purchasers exercising ordinary care.  <u>Mushroom Makers, Inc. V. R.G. Barry Corp.</u>, 580

F.2d 44, 47 (2d Cir. 1978), <u>cert. denied</u>, 439 U.S. 1116 (1979); <u>Coca-Cola Co. V. Snow

Crest Beverages, Inc.</u>, 162 F.2d 280, 284 (1st Cir.) <u>cert. denied</u>, 332 U.S. 809 (1947).

18

Confusion resulting from the consuming public's carelessness, indifference, or ennui will not suffice. The legislature contemplated the reaction of the ordinary person who is neither savant nor dolt, and who exercises a normal measure of the layman's common sense and judgment. <u>United States v. 88 Cases, More or Less, Containing Bireley's Orange Beverage,</u> 187 F.2d 967, 971 (3d Cir.), <u>cert. denied,</u> 342 U.S. 861 (1951).

69. Evidence of actual confusion is not a prerequisite to a finding of "likelihood of confusion," however, it is incomprehensible to imagine a lack of confusion or likelihood of confusion in the factual scenario here presented.

70. Clearly, Financial Services' utilization of the subject domain name (A1Mortgage.com) is "identical or confusingly similar to" Plaintiff A-1's mark insofar as the names are actually identical, letter for letter, but for addition of the internet letters ".com".

71. The Court has found as a fact that Defendant acted with a bad faith intent to confuse consumers and profit from it. The ACPA sets forth a non-exhaustive list of nine (9) factors for the Court to consider when making a determination as to a party's bad faith intent to profit. Said factors are as follows:

    (I)    the trademark or other intellectual property rights of the person, if any, in the domain name;

    (II)    the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III)    the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)    the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)    the person's intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)    the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)    the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)    the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)    the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C.A. §1125 (d)(B)(i)(1999).

72.    A court is not limited to considering these nine factors when determining the presence or absence of bad faith.  The most important grounds for finding bad faith "are the unique

circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute."  Spotty's Farm LLC v. Sportsman's Market, Inc., 202 F.3d 489, 499 (2nd Cir.), cert denied, 530 U.S. 1262 (2000).

73.   In examining the referenced factors, it is apparent that Financial Services exercised a bad faith intent in the acquisition and utilization of the "Al Mortgage.com" domain name.  By virtue of the Settlement Agreement between the parties in the initial lawsuit, Al was to continue use of its trade name and Financial Services was only authorized to continue using its corporate name "A1 Mortgage and Financial Services, LLC."  In this context, the subject domain name is hardly identical to Defendant's corporate name, but more significantly it is identical to Plaintiff's trade name with whom it had been in litigation regarding said name.  In short, Financial Services had no property rights to the name "A1 Mortgage."  (See first and second factors enumerated in §1125(d)(B)(i)).  Prior to purchasing "A1Mortgage.com," Financial Services was using a domain name that was close in appearance  (A1MortgageLLC.com) and which was used with the permission and consent of Plaintiff A1.  (See third factor enumerated in §1125(d)(B)(i)).  As to the fourth factor, Financial Services was not making "fair use" of the domain name, which directed users to Financial Services' website, even though the website had disclaimer language noting that Financial Services was not associated with A1.  The domain name was used to compete with A1.  Regarding the fifth factor of §1125(d)(B)(i), Financial Services was clearly intending to divert potential consumers from A1 and its website with its use of the

21

domain name.  It appears that Financial Services never offered to transfer, sell or otherwise assign the domain name to a third party for financial gain as it acquired the domain name for its own gain.  (See sixth factor enumerated in §1125(d)(B)(i)). Financial Services utilized material or misleading information when it purchased the domain name through Media Post as a straw party.  (See seventh factor enumerated in §1125(d)(B)(i)).  Also, Financial Services utilized another domain name which was confusingly similar to the mark of A1 (A1Mortgagellc.com), although A1 did consent to Financial Services' use of the domain name "A1Mortgagellc.com."   (See eighth factor enumerated in §1125(d)(B)(i)).  In short, a review of the factors set forth in the Lanham Act to determine bad faith intent, demonstrates that Financial Services acted with "bad faith" intent when it purchased and utilized the domain name "A1Mortgage.com."

74.    In view of the contentious litigation history between the parties, Financial Services' alleged desire to simply shorten its domain name for consumer convenience is neither credible nor legitimate and its purposeful action in acquiring and utilizing the subject domain name demonstrates a bad faith intent to profit from Plaintiff A1's mark.

75.    A1 has demonstrated that Financial Services registered the domain name "A1Mortgage.com" with the bad faith intent to profit from Plaintiff's mark.

76.    Section 1125(d)(1)(B)(ii) of the ACPA notes, "bad faith intent described under subparagraph (A) shall not be found in any case in which the Court determines that the

person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C.A. §1125(d)(1)(B)(ii)(1999). This provision is generally known as the "safe harbor" provision.

77.    A defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the Act's "safe harbor" provision. <u>Virtual Works, Inc. v. Volkswagen of American, Inc.</u>, 238 F.3d 264, 270 (4th Cir. 2001).

78.    In view of the protracted litigation history between these parties and the actions of Financial Services which belie that it could have either believed or had reasonable grounds to believe that its acquisition and utilization of the domain name "A1Mortgage.com" was a fair use and was otherwise lawful, the Court finds that Financial Services is not entitled to "safe harbor" protection for its use of the subject domain name.

79.    Indeed, it is well-settled that liability will attach where a defendant knowingly registers a domain name using another's mark, especially for use in commercial competition. <u>Prime Publishers, Inc. v. American-Republican, Inc.</u>, 160 F.Supp.2d 266, 273-282 (D.Conn. 2001) (defendant competitor newspaper liable where it knowingly registered and used a domain name almost identical to the plaintiff's federally unregistered mark); <u>Spears, Leeds & Kellogg v. Rosado</u>, 122 F.Supp.2d 403, 404-406 (S.D.NY), <u>affd</u>, 242 F.3d 368 (2nd Cir. 2000) (defendant liable where he knowingly registered domain name identical to

23

Case 2:03-cv-02002-TFM   Document 64   Filed 03/16/06   Page 24 of 28

plaintiff's federally unregistered trade name); <u>Electronics Boutique Holdings Corp. v. Zuccarini</u>, 2000 U.S. Dist. LEXIS 15719, *2-4 (E.D.Pa. 2000) (liability proper against defendant where he knowingly and intentionally purchased several internet domain names similar to plaintiff's trade name); <u>Pinehurst, Inc. v. Wick</u>, 256 F.Supp.2d 424, 428 (M.D.N.C. 2003) (defendant liable where admitted to knowingly registering domain name because he wanted to have access to plaintiff's potential customers); <u>Mattel, Inc. v. Adventure Apparel</u>, 2001 U.S. Dist. LEXIS 13885, *6-13 (S.D.NY 2001) (defendant liable where many factors met); <u>Shields, et al. v. Zuccarini</u>, 254 F.3d 476, 481-485 (3d Cir. 2001) (defendant liable where he knowingly and intentionally registered spelling variations of plaintiff's trade names.)

80.  A1's trade name is entitled to protection under the ACPA and Financial Services is liable for intentionally and knowingly acquiring and utilizing that trade name and using it to directly compete with A1 Mortgage.

81.  A1's claim in Count VII of its Complaint are the same as its allegations in Count II.

82.  To prevail on an intentional interference with prospective contractual relations claim, a plaintiff must prove: 1) a prospective contractual relation; 2) that defendant's purpose or intent is to harm plaintiff by preventing the relation from occurring; 3) that defendant lacks a privilege or justification; and 4) actual damages to plaintiff as a result of defendant's conduct.

24

83.   A1 has failed to produce credible evidence that Financial Services actually made fraudulent misrepresentations to specific potential customers of A1 with the intention of harming prospective contractual relationships.  Also, A1 has failed to produce credible evidence that it suffered actual damages as a result of this aspect of Financial Services' alleged conduct.  In short, A1 has failed to satisfy its burden of proof with regard to the allegations that Financial Services intentionally interfered with A1's contractual relations. Accordingly, the Court rules against A1 and in favor of Financial Services as to the claims in Count VII of Plaintiff's Complaint.

84.   When a competitor registers and uses a domain name identical to a plaintiff's trade name, an injunction is appropriate.  Pennsylvania Business Bank v. Biz Bank Corp., 330 F.Supp.2d 511, 524-526 (E.D.Pa. 2004); Nike, Inc. v. Circle Group Internet, Inc., 318 F.Supp.2d 688, 690-692 (N.D.Ill. 2004).

85.   Further, once liability under the ACPA has been established, a court has the power within its sound discretion to enter a permanent injunction and/or order the forfeiture, cancellation, or transfer of the domain name to the owner of the mark.  15 U.S.C. §1125(d)(1)(C).  Clark v. Cohen, 613 F.Supp. 684, 690 (E.D. Pa. 1985) aff'd, 794 F.2d 79 (3d Cir.), cert. denied, 479 U.S. 962 (1986).

86.   In deciding whether a permanent injunction should be issued, the Court must determine if the plaintiff has actually succeeded on the merits (i.e., met its burden of proof).  If so, the

Court must then consider the appropriate remedy.  Ciba-Geigy Corp. v. Bolar

Pharmaceutical Co., Inc., 747 F.2d 844, 850 (3d Cir. 1984), cert. denied, 471 U.S. 1137

(1985); Evans v. Buchanan, 555 F.2d 373 (3d Cir.), cert. denied, 434 U.S. 880 (1977).


87.     Permanent injunctive relief is appropriate if: 1) plaintiff is successful in proving the

        merits of the case; 2) there is no available remedy at law; and 3) the balance of the

        equities favors granting such relief.  Ciba-Geigy, 747 F.2d at 850.


88.     A1 has met its burden of proof on the merits of its ACPA claim.  As noted above, A1 has

        demonstrated that "A1Mortgage.com" is confusingly similar if not identical to its mark.

        Additionally, A1 has proven that Financial Services acted with a willful bad faith intent

        to compete and profit when it acquired and utilized the "A1Mortgage.com" domain name.

        As such, this Court will permanently enjoin Financial Services from its use of

        "A1Mortgage.com" and order Financial Services to immediately surrender and transfer

        said domain name to A1.


89.     A1 has asserted a demand for attorney's fees pursuant to its claim under the Lanham Act,

        as set forth in Counts II and III of its Complaint.   The Act specifically provides for

        attorneys' fees, costs, and statutory damages.  15 U.S.C. §§1117, 1125.


90.     The relevant portion of the Lanham Act notes, "[t]he Court in exceptional cases may

        award reasonable attorney's fees to the prevailing party."  15 U.S.C.A. §1117(a)(2002).

To award attorney's fees, the Court must determine that this litigation constituted an "exceptional case."

91.     A case cannot be deemed exceptional under Section 1117(a) unless the losing party is guilty of subjective bad faith.  Ferrero USA, Inc. v. Ozark Trading, Inc., 952 F.2d. 44, 47 (3rd Circ. 1991).  Specifically, before a case can qualify as "exceptional," the Court must make a finding of culpable conduct by the losing party, such as bad faith, fraud, malice or knowing infringement.  Ferraro, 952 F.2d at 47.

92.     There is no doubt of the bad faith, malice and knowing infringement evidenced by the conduct of Financial Services in this case which results in the Court's conclusion that this constitutes an exceptional case.

93.     A1 is the "prevailing party" on its claims under the Lanham Act (Counts II and III) in this exceptional case.  As such, A1 is entitled to receive an award of reasonable attorney's fees and costs which will be determined by the Court through the post-verdict filing by Plaintiff of an appropriate fee petition in accordance with lodestar standards with supporting documentation, affidavits and brief within thirty (30) days.  Defendant may file a response and brief in opposition thereto within thirty (30) days thereafter.

94.     Pursuant to 15 U.S.C. §1117(d), a plaintiff may also recover statutory damages in lieu of actual damages and profits.

27

95.     The recovery of statutory damages in cybersquatting cases fulfills two functions: it deters wrongful conduct and provides adequate remedies for trademark owners who seek to enforce their rights in court.  <u>Electronics Boutique</u>, 2000 U.S. Dist. LEXIS at *23-24.

96.     Statutory damages are essential, since "actual damages suffered by a plaintiff as a result of lost customers and goodwill is incalculable."  <u>Id.</u> at *24.

97.     Statutory damages may range between $1,000 and $100,000 per infringing domain name, based on the court's determination of what is fair and just.

98.     Based on the facts established by A1 and the incalculable nature of A1's loss and damages, statutory damages are appropriate and the Court awards A1 the sum of $50,000.00 to be paid by Financial Services within thirty (30) days.

March 16, 2006                                    BY THE COURT:

                                                  s/  Terrence F. McVerry
                                                  United States District Court Judge

cc:     Jason A. Archinaco, Esquire
        Email: archinacoj@whiteandwilliams.com
        Steven J. Forry, Esquire
        Email: forrys@whiteandwilliams.com

        C. Christopher Hasson, Esquire
        Email: chasson@nauticom.net